UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| ROBERT NICHOLAS POUNDS,<br><br>                  Petitioner,<br>    v.<br><br>ROBERT JACKSON,<br><br>                  Respondent. | CASE NO. 2:23-cv-01021-JCC-DWC<br><br>REPORT AND RECOMMENDATION<br><br>Noting Date: November 24, 2023 |

The District Court has referred this action to Chief United States Magistrate Judge David W. Christel. Petitioner Robert Nicholas Pounds, proceeding *pro se*, filed his federal habeas petition, pursuant to 28 U.S.C. § 2254, seeking relief from his state court convictions and sentence. *See* Dkts. 1, 4. The Court concludes the state court's adjudication of the sole ground raised in the Petition was not contrary to, nor an unreasonable application of, clearly established federal law. Therefore, the undersigned recommends the Petition be denied and a certificate of appealability not be issued.

REPORT AND RECOMMENDATION - 1

I.     **Background**

A.  Factual Background

On November 8, 2017, in the Superior Court of Washington for King County ("trial court"), a jury found Petitioner guilty unlawful possession of a firearm in the first degree and theft of a firearm. *See* Dkt. 8-1 at 2 (Exhibit 1). The Court of Appeals of the State of Washington ("state court of appeals") summarized the facts of Petitioner's case as follows:

> In 2017, 79-year-old William Hansen lived alone in a house in SeaTac. Over the course of his life, Hansen collected nearly two dozen rifles and handguns that he stored in a locked metal cabinet located in his bedroom.
>
> Huong Vuong, an across-the-street neighbor, occasionally checked in on Hansen. On May 29, 2017, Vuong felt strange about a woman she saw outside Hansen's home, so Vuong took several pictures of the woman and a black Toyota Celica the woman drove.
>
> On June 5, 2017, Kimberly Ausbun, Hansen's acquaintance, was visiting him. Hansen left Ausbun at his home by herself while he drove to a bank in Kent. Vuong, who was holding a yard sale in front of her home, saw Hansen leave his home.
>
> About 15 minutes after Hansen departed, Vuong saw a man park his red minivan near Hansen's house, with the front end facing Vuong's home and the rear facing Hansen's. The man then browsed Vuong's yard sale while Ausbun stood near the street and introduced herself to Vuong as "Kim." The man took a lawn mower that Vuong was giving away for free and pushed it to his minivan. As the man pushed the lawn mower away, Ausbun told the man something akin to "'I forgot my keys.'" Ausbun and the man hurried off and entered Hansen's house. At that point, Vuong stood in her front yard and watched Hansen's house for a little bit.
>
> Vuong next saw the man running from the back door of Hansen's house, carrying a hefty bundle of something wrapped in fabric, towards the minivan. As the man hurried to the minivan, his eyes looked around cautiously as if to see if anyone was watching. The man placed the bundle into the back of the minivan and then ran back into the house. Finding these activities very suspicious and strange, at 1:58 p.m. Vuong called 911 to report a burglary in progress.
>
> Minutes later, at 2:06 p.m., the first of multiple King County sheriff's deputies arrived at Hansen's house for a burglary in progress. The deputies surrounded Hansen's house and one used a patrol vehicle's loudspeaker to hail the persons inside Hansen's house to come out. Ausbun exited Hansen's house first, and the man exited several minutes later. Deputies detained the man in a patrol vehicle and

REPORT AND RECOMMENDATION - 2

identified him as Robert Pounds. While clearing Hansen's house and checking for additional suspects, deputies observed an open gun cabinet in the bedroom and saw several rifles laying on the bed.

While deputies were speaking with Ausbun and Pounds, Hansen returned home from the bank. Hansen informed the deputies that Ausbun had permission to be in the house and insisted that his guns were locked away in the cabinet. Hansen kept the only key to the gun cabinet in his pocket. He refused to go inside with the deputies to inspect his gun cabinet. Deputies then released Ausbun and Pounds.

A King County sheriff's sergeant last saw Pounds in the driver's seat of the red minivan while Ausbun was outside talking to Hansen. Vuong later saw Pounds and Ausbun leave together in the red minivan. The last deputy to leave the scene—after Pounds and Ausbun drove away—departed Hansen's house at 2:45 p.m.

Shortly thereafter, Hansen entered his home and discovered his gun cabinet had been forced open and most of his guns were missing. At 3:08 p.m., Hansen called 911 to report the theft.

At 4:24 p.m., a deputy returned to Hansen's home to take a report. Hansen showed the deputy that the gun cabinet had been pried open, possibly with a crowbar from his garage that was left behind on the bed. Two rifles were left on the bed and another rifle was left on the floor. The cabinet was mostly cleaned out. From memory, Hansen gave the deputy a list of many of the makes and calibers of his missing guns. Among the 10 firearms identified on Hansen's list of missing guns were three revolvers: a Harrington & Richardson .22-caliber revolver, a Colt .22-caliber revolver, and a Ruger .357-caliber revolver.

At 5:13 p.m., another deputy who had been responding to a medical emergency within five minutes of Hansen's house, responded to a report of an abandoned vehicle. According to nearby residents, a female driver noticed the medical emergency activity, turned into their driveway, exited the vehicle, and ran through their backyard.

Upon arrival, the deputy noticed the abandoned black Toyota Celica, with its windows down and doors unlocked, damaged ignition, and missing stereo. The deputy suspected the vehicle was stolen, and he could not reach the registered owner. While impounding the Toyota Celica and inventorying its contents, the deputy discovered a backpack in the trunk that contained three handguns: a Harrington & Richardson .22-caliber revolver; a Colt .22-caliber revolver, and a Ruger .357-caliber revolver. Later that evening, the deputy conducted a search that revealed Hansen to be the registered owner of the Colt .22-caliber revolver.

On June 8, 2017, a sheriff's detective began investigating Hansen's stolen firearms. The detective interviewed Vuong and Hansen, and showed photo montages

REPORT AND RECOMMENDATION - 3

containing Pounds and Ausbun to the residents who had witnessed the woman abandon the Toyota Celica, but they were not able to make any identifications.

On June 13, 2017, the detective and his sergeant went in search of Pounds to arrest him and located him driving the red minivan in between Burien and Seattle. Upon arrest, the detective found a single round of .22-caliber ammunition in Pounds' pants pocket. The detective also saw Ausbun walking with another woman nearby.

After obtaining a search warrant, on June 14, 2017, the detective and sergeant searched the red minivan and collected various items, including a wallet containing bank cards in Pounds' name, Pounds' driver's license, an Olympic .22-caliber pistol, two loaded magazines that fit the pistol, ammunition contained in the magazines, a green military-style ammunition can that contained old gun-cleaning supplies, and a brown rifle-cleaning kit.

On August 4, 2017, the State charged Pounds with unlawful possession of a firearm in the first degree (count 1) and theft of a firearm (count 2). The bifurcated trial commenced before a King County jury on November 2, 2017. The State called several witnesses to testify at trial, including Vuong, Hansen, and several King County sheriff's officers.

At trial, Vuong testified that the woman she photographed on May 29, 2017, who drove a black Toyota Celica was the same woman who identified herself as "Kim" on June 5, 2017. Vuong also testified that she did not see anybody else besides Hansen go into his house after Ausbun, Pounds, and the sheriff's officers left the scene.

In pertinent part, Hansen testified that when he went to the bank on June 5, 2017, his gun cabinet was locked and nothing was on his bed. He explained to the jury that although he left Ausbun in his house to take a shower that day, he did not give her permission to have anyone else at the house in his absence. Upon his return from the bank, Hansen saw only a "[b]unch of cops" and Ausbun standing outside his home, but had neither seen Pounds nor had he ever heard of Pounds.

Hansen also recognized the gun cleaning kits and firearms that were stolen from his home and identified several of those items for the jury. Hansen testified about buying a military ammunition can (containing gun cleaning material) in the late 1950's from an Army surplus store around the time he got out of the Navy. He explained that he realized his gun cleaning supplies were missing when he "talked to the cops that day, and they said my safe is broken." He also identified the pistol that sheriff's officers located in the minivan as his Chinese-made, .22-caliber copy of a pistol from the 1936 Olympics, equipped with a counterweight to "make it easier to hold."

Deputy Joe Emrick provided testimony matching the license plate number of the abandoned black Toyota Celica on June 5, 2017, and the license plate number of

REPORT AND RECOMMENDATION - 4

the Celica that Vuong photographed on May 29, 2017. Detective Benjamin Wheeler testified that upon showing Hansen some of the recovered firearms, Hansen had "immediate reactions to seeing them, and immediate commentary on them." Detective Wheeler described the contents of the green military ammunition can and brown rifle cleaning kit that he discovered in the red minivan. Upon showing these two cleaning kits to Hansen, Detective Wheeler explained how Hansen was able to describe their contents without either of those containers being opened. Detective Wheeler also testified that Hansen consistently estimated that 12 of his firearms were stolen. Deputy Edward Brady testified that on July 7, 2017, he made a routine traffic stop of a red minivan which was being driven by Ausbun.

The State also presented postarrest recordings of several jail calls between Pounds and Ausbun, in which they discussed loving each other, having sex, and getting married. Pounds did not testify in his defense.

At the close of evidence, in phase I jury instruction 6, the trial court informed the jury that "[a] person is guilty of theft of a firearm if he or she commits a theft of any firearm." In phase I jury instruction 7, the trial court listed the elements the State needed to prove for count 2 (theft of a firearm), which included the caliber and type of firearm that was allegedly stolen:

> To convict the defendant of the crime of theft of a firearm, each of the following four elements of the crime must be proved beyond a reasonable doubt:
>
> (1) That between June 5, 2017, and June 13, 2017, the defendant wrongfully obtained a .22 caliber revolver belonging to another;
> (2) A .22 caliber revolver is a firearm;
> (3) That the defendant intended to deprive the other person of the firearm; and
> (4) That this act occurred in the State of Washington.
>
> If you find from the evidence that elements (1), (2), (3) and (4) have been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
>
> On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to anyone of elements (1), (2), (3), or (4) then it will be your duty to return a verdict of not guilty.

In phase I jury instruction 8, the court provided the jury with the following unanimity instruction:

> The State alleges that the defendant committed acts of Theft of a Firearm on multiple occasions. To convict the defendant of Theft of a Firearm, one particular act of Theft of a Firearm must be proved beyond a reasonable

REPORT AND RECOMMENDATION - 5

doubt, and you must unanimously agree as to which act has been proved. You need not unanimously agree that the defendant committed all the acts of Theft of a Firearm.

In phase II jury instruction 5, the trial court similarly listed the elements the State needed to prove for count I (unlawful possession of a firearm), which did not list the caliber or type of firearm:

To convict the defendant of the crime of unlawful possession of a firearm in the first degree as charged in Count 1, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That between June 5, 2017 and June 13, 2017, the defendant knowingly had a firearm in his possession or control;
(2) That the defendant had previously been convicted of a "serious offense"; and
(3) That the possession or control of the firearm occurred in the State of Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty as to Count 1.

On the other hand, if after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty as to Count 1.

On November 8, 2017, the jury returned verdicts finding Pounds guilty of theft of a firearm in the first degree and guilty of unlawful possession of a firearm.

Dkt. 8-1 at 71-79 (footnotes omitted); *State v. Pounds*, 9 Wash. App. 2d 1018 (2019).

B. Procedural Background

1. *Direct Appeal*

On December 15, 2017, the trial court sentenced Petitioner to total confinement of 125 months. Dkt. 8-1 at 2-6 (Exhibit 1). Petitioner challenged his convictions and sentence on direct appeal. *See id*. at 9-27 (Exhibit 2). The state court of appeals affirmed Petitioner's convictions. *Id*. at 71-85 (Exhibit 5). Petitioner sought discretionary review by the Washington State Supreme Court ("state supreme court"). *Id*. at 87-118 (Exhibit 6). On November 6, 2019, the state supreme

REPORT AND RECOMMENDATION - 6

court denied Petitioner's petition for review without comment. *Id*. at 120 (Exhibit 7). The state court of appeals issued its mandate on December 24, 2019. *Id*. at 122 (Exhibit 8).

       2.  *Personal Restraint Petition*

Petitioner filed a state collateral attack, a personal restraint petition ("PRP"), on February 19, 2020. Dkt. 8-1 at 124-324 (Exhibit 9). The acting chief judge for the state court of appeals appointed Petitioner counsel and referred his PRP to a panel of judges. *Id*. at 434-35 (Exhibit 12). The state court of appeals denied the PRP on November 8, 2021. *Id*. at 610-24 (Exhibit 16). Petitioner sought discretionary review from the state supreme court (Dkt. 8-1 at 626-81, Exhibit 17), and the deputy commissioner for the state supreme court denied review on March 21, 2022 (Dkt. 8-1 at 713-17, Exhibit 20). On July 13, 2022, the state supreme court denied Petitioner's motion to modify the deputy commissioner's ruling (Dkt. 8-1 at 719, Exhibit 21), and the certificate of finality was issued on July 27, 2022 (Dkt. 8-1 at 740, Exhibit 23).

       3.  *Federal Petition*

On July 6, 2023, Petitioner initiated this case. Dkt. 1. In his Petition (Dkt. 4), Petitioner raised the following ground for relief:

> Fifth, Fourteenth Amendments Due Process Violation. The jury instructions confused the jury. . . Inquiry from the jury and court's response as to what to convict. The trial court did not give specific to convict instruction. It is to this day unknown as to what crime Defendant/Petitioner is under restrain or convicted of. Defendant/Petitioner entitle of knowing what crime he is incarcerated on.

Dkt. 4 at 5 (errors in original). On August 25, 2023, Respondent filed, and served on Petitioner, an Answer to the Petition. Dkts. 7, 8. In the Answer, Respondent asserts the state court's adjudication of the sole ground raised in the Petition was not contrary to, nor an unreasonable application of, clearly established federal law. Dkt. 7. Petitioner filed a traverse on September 11, 2023. Dkt. 9.

## II. Discussion

Respondent maintains the state courts' adjudication of the sole ground raised in the Petition was not contrary to, nor an unreasonable application of, clearly established federal law. Dkt. 7.

### A. Standard of Review

Pursuant to 28 U.S.C. § 2254(d)(1), a federal court may not grant habeas relief on the basis of a claim adjudicated on the merits in state court unless the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." In interpreting this portion of the federal habeas rules, the Supreme Court has ruled a state decision is "contrary to" clearly established Supreme Court precedent if the state court either (1) arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) confronts facts "materially indistinguishable" from relevant Supreme Court precedent and arrives at an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Moreover, under § 2254(d)(1), "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411; *see Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). An unreasonable application of Supreme Court precedent occurs "if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. In addition, a state court decision involves an unreasonable application of Supreme Court precedent "'if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context

where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Williams*, 529 U.S. at 407).

The Anti-Terrorism Effective Death Penalty Act ("AEDPA") requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Further, review of state court decisions under §2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

B. <u>Jury Instruction Error (Ground 1)</u>

In the sole ground raised in the Petition, Petitioner contends his constitutional rights were violated when the jury instructions confused the jury and the trial court failed to give a specific "to convict" instruction. Dkt. 4 at 5.

Claims of error concerning state jury instructions are generally matters of state law that are not cognizable on federal habeas review. *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). An alleged error in a state court's determination of whether state law allowed for a particular instruction cannot form a basis for federal habeas relief. *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005) (citing *Estelle*, 502 U.S. at 67-68). Likewise, the failure to give an instruction which might be proper as a matter of state law does not, by itself, merit federal habeas relief. *Id*.

Federal habeas relief is available only when the petitioner demonstrates that the instructional error "so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). Where the challenge is to the failure to give an instruction, the petitioner's burden is "especially heavy"

because "[a]n omission, or an incomplete instruction is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

Here, the state court of appeals considered Petitioner's jury instruction claim and stated,

> Jury instructions must accurately inform the jury of the relevant law. State v. Henderson, 192 Wn.2d 508, 512, 430 P.3d 637 (2018). Unless shown otherwise, we presume a jury follows the court's instructions. State v. Swan, 114 Wn.2d 613, 661-62, 790 P.2d 610 (1990). In response to a jury question after deliberations begin, CrR 6.15(f)(1) permits a trial court to provide supplemental written instructions on "any point of law." We review a trial court's decision whether to give a supplemental instruction for abuse of discretion. State v. Sublett, 176 Wn.2d 58, 82, 292 P.3d 715 (2012).
>
> Here, jury instruction 6 told the jury, "A person is guilty of theft of a firearm if he or she commits a theft of any firearm." The "to convict" jury instruction, number 7, told the jury that to convict Pounds of "theft of a firearm," it must find that the State proved each of these elements beyond a reasonable doubt:
>
>> (1) That between June 5, 2017, and June 13, 2017, the defendant wrongfully obtained a .22 caliber revolver belonging to another;
>> (2) A .22 caliber revolver is a firearm;
>> (3) That the defendant intended to deprive the other person of the firearm; and
>> (4) That this act occurred in the State of Washington.
>
> And jury instruction 8 told the jury:
>
>> To convict the defendant of Theft of a Firearm, one particular act of Theft of a Firearm must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved. You need not unanimously agree that the defendant committed all the acts of Theft of a Firearm.
>
> During deliberations, jurors sent the following question to the court:
>
>> Instructions 6 & 8 state "theft of any firearm" and "theft of a firearm" on multiple occasions. Instruction 7 specifically states "a .22 caliber revolver." Are we ruling only on a .22 caliber revolver (7) or are we ruling on any firearm presented in the case (8)?
>
> The court e-mailed the jury question to the parties and asked for their input. The State agreed with the court's proposed response to "re-read your instructions." Defense counsel asked the court to refer the jury back to instruction 7, the to-convict instruction, but the court declined.

REPORT AND RECOMMENDATION - 10

> Pounds relies on several cases to argue that the court's answer to the jurors' question failed to "clarify the applicable law for the jury," warranting reversal. Each case is distinguishable. In Gotcher and Davenport, the prosecutors misstated the law in closing arguments and it was apparent from the juries' questions that the misstatements created confusion. State v. Gotcher, 52 Wn. App. 350, 355-56, 759 P.2d 1216 (1988); State v. Davenport, 100 Wn.2d 757, 759, 765, 675 P.2d 1213 (1984). Even so, the courts did not correct the errors in response to the questions. Gotcher, 52 Wn. App. at 356; Davenport[,]100 Wn.2d at 759. In Campbell, one of the jury instructions contained an erroneous statement of law that the court compounded in its answer to a jury question. State v. Campbell, 163 Wn. App. 394, 401-02, 260 P.3d 235 (2011), rev'd on recons., 172 Wn. App. 1009 (2012). And in Young, the trial court refused to clarify the meaning of a technical term and instead referred the jury back to the instructions as a whole, even though none of the instructions contained any information about the term's meaning. State v. Young, 48 Wn. App. 406, 417, 739 P.2d 1170 (1987).
>
> Pounds does not argue that the jury instructions here were legally flawed or that the court did not sufficiently explain a technical term. Instead, he argues that the court should have directed the jury to the more specific to-convict instruction to clarify the law rather than the instructions as a whole. But we presume the jury followed the court's instruction to consider all of the instructions, including the to-convict instruction. While the trial court could have elected to answer the jury's question by referring it to the elements listed in instruction 7, it did not have to.

Dkt. 8-1 at 620-22 (footnote omitted).

On discretionary review, the state supreme court affirmed the state court of appeals, finding no constitutional violation and stating,

> Mr. Pounds first argues that the superior court erred in failing to adequately answer a jury inquiry during deliberations. The jury asked about the instructions on the theft of a firearm charge. One instruction told the jury that a person is guilty of theft of a firearm if the person "commits a theft of any firearm." The State focused its case on a .22 caliber revolver belonging to the theft victim, although the evidence showed the existence of multiple firearms. Consistent with the State's approach, the "to convict" jury instruction (number 7) told the jury that to find Mr. Pounds guilty, it had to find that during a certain period of time Mr. Pounds wrongfully obtained a .22 caliber revolver belonging to another. To ensure juror unanimity as to the firearm stolen, the court in another instruction (number 8) told the jury that one particular act of theft of a firearm had to be proven, and that it had to unanimously agree which act was proven but did not have to agree that Mr. Pounds committed all of the acts of theft of a firearm that the evidence may have shown. Inquiring about these instructions, the jury asked: "Are we ruling only on a .22 caliber revolver (7) or are we ruling on any firearm presented in the case (8)?" The

REPORT AND RECOMMENDATION - 11

parties and the court discussed how to answer the inquiry, the State agreeing with the court that the jury should only be told generally to reread the instructions, and defense counsel advocating for an answer referring the jury specifically to the to-convict instruction. The court ultimately told the jury only to reread the instructions. Mr. Pounds argues, first, that the court erred in not giving an answer specifically referring to the to the to-convict instruction, and second, that defense counsel was ineffective in not offering the court authority supporting a specific answer.

But Mr. Pounds does not show the Court of Appeals erred in rejecting these arguments. Review of the trial court's response to the jury's inquiry is reviewed only for abuse of discretion, and depending on the circumstances, it is not an abuse of discretion to tell the jury only to reread the instructions. *State v. Ng*, 110 Wn.2d 32, 43, 750 P.2d 632 (1988); *State v. Sutton*, 18 Wn. App. 2d 38, 42-45, 489 P.3d 268, *review denied*, 198 Wn.2d 1022 (2021). *Sutton* is very similar to this case. The jury there was instructed that a person commits the offense of leading organized crime if the person intentionally organizes, manages, directs, supervises, or finances "any three or more persons" with intent to engage in a pattern of criminal profiteering. *Sutton*, 18 Wn. App. 2d at 41. The to-convict instruction told the jury that to find the defendant guilty of leading organized crime, it had to find that the defendant intentionally organized, managed, directed, supervised, or financed three specifically named persons. *Id*. Referring to these instructions, the jury inquired during deliberations whether the defendant must have organized the three named persons specifically or any three or more persons. Defense counsel advocated an answer referring specifically to the to-convict instruction, but the superior court opted to refer the jury to the instructions generally. The Court of Appeals found no abuse of discretion, noting that the to-convict instruction was clear, that the jury was presumed to have followed the court's instructions, and that the jury asked no further questions after the court answered its inquiry. In these circumstances, the court held that the jury's single question did not overcome the presumption that the jury followed the instructions, nor did it create an inference that the entire jury was confused or that any confusion was not clarified before it reached a verdict. *Id*. at 44-45. Precisely the same can be said in this case. It may be presumed that the jury followed the court's instruction to find Mr. Pounds guilty only if it found he stole a .22 caliber revolver.

Mr. Pounds urges that a pinpointed answer with reference to the to-convict instruction is dictated by the Supreme Court's decision in *Weeks v. Angelone*, 528 U.S. 225, 120 S. Ct. 727, 145 L. Ed. 2d 727 (2000), reaffirmed by its decision in *Waddington v. Sarausad*, 555 U.S. 179, 129 S. Ct. 823, 172 L. Ed. 2d 532 (2009). But the Court in *Weeks* said only that *nothing more* than the pinpoint answer the trial court gave was constitutionally required; it did not hold that anything less was constitutionally deficient. *Weeks*, 528 U.S. at 234. It is in fact not the federal law under *Weeks* that reference to the jury instructions generally is always a constitutionally deficient answer. When the jury's question does not indicate the jury is affirmatively misinterpreting the law and the court's original instructions correctly state the law and generally address the jury's question, the court acts

REPORT AND RECOMMENDATION - 12

within its discretion by simply referring the jury to the instructions already given. *Crowley v. Epicept Corp.*, 883 F.3d 739, 750-51 (9th Cir. 2018); *Arizona v. Johnson*, 351 F.3d 988, 995-96 (9th Cir. 2003). These circumstances are present here: the jury's inquiry did not evidence a misinterpretation of the law, and the superior court's instructions otherwise correctly stated the law and addressed the inquiry.

Dkt. 8-1 at 714-16 (footnote omitted).

As stated above, the mere fact that the trial court did not provide a specific jury instruction or instruct the jurors in a specific manner is not sufficient to merit federal habeas relief. A federal habeas Petitioner must demonstrate that the errors surrounding the jury instructions resulted in a conviction that violated due process.

Here, as accurately detailed by the state courts, the jury inquired about the jury instructions during deliberations. The trial court, responding to the jury's inquiry, instructed the jury to re-read the instructions generally, rather than directing the jury to the specific "to convict" instruction (Instruction 7). "When the jury's question does not indicate that the jurors were affirmatively interpreting the law incorrectly, and the court's original instructions provide a correct statement of the law and generally address the jury's question, a . . . court acts within its discretion by simply referring the jury to the instructions they had already been given." *Crowley v. Epicept Corp.*, 883 F.3d 739, 750–51 (9th Cir. 2018) (cleaned up).

Petitioner does not contend the jurors were interpreting the law incorrectly or that the instructions provided an incorrect statement of the law. Petitioner argues his constitutional rights were violated because the trial court did not specifically refer the jurors to the "to convict" instruction. Petitioner has not cited to, nor does the Court find, any clearly established federal law that requires the trial court to direct the jury to the specific "to convict" instruction in this situation. Furthermore, it is presumed that the jury will follow the instructions of the trial court and consider

REPORT AND RECOMMENDATION - 13

1  *all* jury instructions. *Penry v. Johnson*, 532 U.S. 782, 799 (2001) (jury is generally presumed to follow the instructions it is given).

2  The failure to give a specific jury instruction does not state a cognizable habeas claim and Petitioner has not shown his due process rights were violated when the trial court did not specifically direct the jury to the "to convict" instruction after the jury inquiry. Therefore, Petitioner fails to demonstrate the state court's conclusion that Petitioner's right to a fair trial was not violated based on the trial court's response to the jury inquiry was contrary to, or an unreasonable application of, clearly established federal law. Accordingly, the sole ground raised in the Petition should be denied.

### III. Evidentiary Hearing

The decision to hold an evidentiary hearing is committed to the Court's discretion. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Id.* at 474. In determining whether relief is available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the state court. *Cullen*, 563 U.S. at 181-82. A hearing is not required if the allegations would not entitle Petitioner to relief under §2254(d). *Landrigan*, 550 U.S. at 474. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id*. The Court does not find it necessary to hold an evidentiary hearing because, as discussed in this Report and Recommendation, Petitioner's ground for relief may be resolved on the existing state court record.

REPORT AND RECOMMENDATION - 14

### IV. Certificate of Appealability

A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district court's dismissal of the federal habeas petition only after obtaining a certificate of appealability from a district or circuit judge. *See* 28 U.S.C. § 2253(c). "A certificate of appealability may issue . . . only if the [petitioner] has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

No jurist of reason could disagree with this Court's evaluation of Petitioner's claim or would conclude the issues presented in the Petition should proceed further. Therefore, the Court concludes Petitioner is not entitled to a certificate of appealability with respect to the Petition.

### V. Conclusion

For the above stated reasons, the Court concludes Petitioner has not shown the state courts' adjudication of the sole ground raised in the Petition was contrary to, or an unreasonable application of, clearly established federal law. Additionally, an evidentiary hearing is not necessary. Therefore, the Court recommends the Petition be denied and a certificate of appealability not be issued.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of *de novo* review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v.*

*Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the Clerk is directed to set the matter for consideration on November 24, 2023, as noted in the caption.

Dated this 8th day of November, 2023.

*/s/ David W. Christel*
David W. Christel
Chief United States Magistrate Judge

REPORT AND RECOMMENDATION - 16